**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **Children of the Court, a non-profit corporation,** and, **Judiciocracy LLC** | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| | ) | Case No: 25-cv-03387 |
| v. | ). | Hon. April M. Perry |
| | ) | |
| **Attorney Registration and Disciplinary Commission, Lea S. Gutierrez, and Tammy Evans, in their official capacities** | ) ) ) ) | |
| *Defendants*. | | |

**FRIST AMENDED COMPLAINT**

Children of the Court, a non-profit corporation, and Judiciocracy LLC ("Judiciocracy") (together "Plaintiffs"), bring the underlying lawsuit for, *inter alia*, violations of Plaintiffs' First Amendment rights for interfering with their access to legal counsel and for preventing their ability to speak. Plaintiffs are seeking declaratory relief from Defendants Lea S. Gutierrez and Tammy Evans in their official capacities as administrator for Illinois' Attorney Registration and Disciplinary Commission ("ARDC"), (together "Defendants") to ascribe the Plaintiffs' speech as their own. Defendants admit they are attempting to stifle criticism of judicial officers by attacking the attorneys who work for it for one act alone – helping the Plaintiffs *speak legally*. Plaintiffs seek to enjoin Defendants from further ascribing organizational speech to their attorney for the purposes of punishment. Plaintiffs additionally seek damages. Plaintiffs allege as follows:

## <u>THE PARTIES</u>

1.      Plaintiff Children of the Court is a Missouri non-profit corporation.

2.      Plaintiff Judiciocracy LLC ("Judiciocracy") is a Missouri limited liability company.

1

3.     Defendant Illinois Attorney Registration and Disciplinary Commission that is a public body responsible for attorney conduct.

4.     The ARDC is a state actor, at all times acting under the color of state law.

5.     Defendant Lea S. Gutierrez is the current Administrator of the ARDC and is being sued only in her official and representative capacity

6.     At all times material hereto, she has been a state actor, acting under the color of state law.

7.     Defendant Tammy Evans is Senior Legal Counsel for the ARDC and is being sued only in her official and representative capacity.

8.     At all times material hereto, she has been a state actor, acting under the color of state law.

## JURISDICTION AND VENUE

9.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because Plaintiffs allege violations of constitutionally protected rights and privileges.

10.     The Plaintiffs are not the subject of nor are they a party too any related state proceeding: *judicial*, *administrative*, or otherwise.

11.     Plaintiffs are not permitted to intervene in nor otherwise appear in support of their Executive Director in any related state proceedings.

12.     Plaintiffs have no other avenue of redress for violations of their First Amendment rights than to invoke federal laws which proport to protect the same from abrogation by state acts.

13.     For the reasons stated in Paragraphs 10-12, abstention pursuant to the *Younger Abstention* doctrine is inappropriate.

14.     The Court has personal jurisdiction over Defendants because each of the Defendants have operated and currently operates within the Northern District of Illinois and *importantly* each of the acts giving rise to the current lawsuit occurred within the Northern District of Illinois.

15.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) because the acts or omissions giving rise to Plaintiffs' claims occurred in this District – specifically, Plaintiffs' constitutionally protected rights were violated within the Northern District of Illinois.

## FACTUAL ALLEGATIONS

### *Children Of The Court*

16.     Children of the Court was founded by Social Entrepreneurship students and their professor – Coach Weinhaus (hereafter "Mr. Weinhaus") – at UCLA in 2023. It always was and is a group endeavor.

17.     The students lead with all aspects of the creation of the organization. The students grappled with the toughest issue in judicial reform – lawyers are punished by disciplinary bodies for criticizing judges who run those very same disciplinary bodies. The group determined that finding an attorney willing to help the organization speech even though that person may become a target of people just like the Defendants was integral to the value and success of the organization.

18.     Likewise, the group learned and applied an important part of non-profits – they rarely have money for marketing or operations. Thus, getting guaranteed operating funding is a big selling point. Selling points like that should be promoted with alacrity to improve acceptance to help accomplish the non-profits mission.

3

19.     Thus the students created an advocacy group committed to helping children of divorce visit the courtrooms and judges who had an outsized influence on their childhood once they become adults as alleged in *Children of the Court et al v. Hon. Abbey Fishman Romanek*, N.D. Ill. Case 1:24-cv-08785[1]; and advocating for court administrative changes that prioritize the assignment of parental rights case in family law to judges with relevant personal experience, i.e. having once been parents themselves or members of the foster community. These twin purposes are intended to ensure that children's best interests are always considered for the improvement of the judicial system.

20.     Children of the Court aims to achieve these goals through, *inter alia*, research, advocacy, and collaboration with legal professionals to help judges and understand the unique needs of the children that are impacted by their decisions, resulting in more compassionate and informed decision making. By ensuring judges have the appropriate experience when making parental decisions, Children of the Court seeks to increase the esteem the public has for the judiciary.

21.     Children of the Court works with judges when they avail themselves to speak. A sample of those judges include:

   a.  Hon. William Steward Boyd (Cook County, Illinois)

   b.  Hon. Robert W. Johnson (Cook County, Illinois)

   c.  Hon. Cory Liu (Travis County, Texas)

22.     Children of the Court advises these judges, when asked, for its thoughts related to one of its core principles – advocating against the assignment of parental rights cases to judges

---

[1] Aside from the claims made therein, that case raises an important issue of "who is responsible for courtrooms being open to the public?" The case was dismissed and is before the Seventh Circuit Court of Appeals.

who lack any parental experience and are not active members of the foster care system. Judge Liu in Texas is one such judge who is subject to a master calendar – he could have any case on any given day. Although it is inappropriate to share the details of Children of the Court's counsel, Judge Liu received thoughts on pitfalls to avoid in keeping with the organization's mission to improve the justice system.

23.     Children of the Court was funded as part of a settlement between Mr. Weinhaus and a third-party in an unrelated lawsuit. <u>See</u> Cook County Case # 2016CH07155.

24.     The lawsuit required judicial approval by the Hon. Thaddeus L. Wilson under Delaware Chancery Ct. Rule 23.1.

25.     Judge Wilson reviewed the settlement agreement which specifically called for the funding of Children of the Court and explained part of its mission. The settlement agreement contained these clauses:

> WHEREAS, Plaintiff Weinhaus is requiring Locality to agree to fund the non-profit he worked to build as part of a class project at the University of California Los Angeles (UCLA) called "Children of the Court" which will seek to ensure domestic relations judges who have never been a parent or are not part of the foster system are not ruling on issues related to the care of children;

> Children of the Court in an amount not to exceed $10,000 per year for 10 years. Plaintiff Weinhaus agrees not to earn compensation from this venture as a condition of this funding.

("WILSON SETTLEMENT TERMS").

27.     Judge Wilson was aware of Weinhaus' prior judicial reform activism and particularly his concerns about improper training, experience, and oversight of the Hon. Regina A. Scannicchio because another party had put that information into motions before Judge Wilson. He had considered and ruled on those prior motions.

28.     Nonetheless, even though the Hon. Regina A. Scannicchio is widely known not to have had parental experience and was not known to be an active member of the foster community, Judge Wilson approved the settlement which included the WILSON SETTLEMENT TERMS

5

calling for Children of the Court to "ensure domestic relations judges who have never been a parent or are not part of the foster system are not ruling on issues related to the care of the children."

29.     His 15-day review period allowed him also to determine whether the $100,000 that would be paid to the non-profit at the expense of the Defendant's shareholders was a fair settlement. He ultimately decided that the total settlement, including the Wilson Settlement Terms, was worthy of approval.

30.     He then agreed to enforce the whole thing. That is, he ordered its foundation and agreed to enforce its funding.

31.     Judge Wilson expressed great enthusiasm in public at the settlement of the case. His agreement to the terms, and thereafter, to enforce them as in his order were greatly appreciated by the parties.

32.     Consequentially, although Children of the Court receives 10 years of funding and Weinhaus is to lead it, according to the Judge Wilson approved settlement, Mr. Weinhaus must serve as a *volunteer* to the organization, ensuring no violation of the Private Inurement doctrine.

33.     Now, the Hon. Patrick T. Stanton oversees and enforces the funding of Children of the Court. As recently as October 14, 2025, he issued declaratory relief:

"declaring that Children of the Court retains the authority to indemnify Weinhaus at its discretion for actions taken on behalf of Children of the Court without violating the existing Settlement Agreements of April 18, 2023."

34.     The organization has a board comprised of four members, and an operations manager who was part of the founding student UCLA cohort.

35.     The organization is also an association which benefits its members who sign onto the "Children of the Court Pledge" which assists the association's members help their minor

6

children visit the courtrooms where their childhood was decided by judicial penstroke upon the children becoming adults. Eg. *Children of the Court et al. v. Abbey Fishman Romanek*, No. 1:2024cv08785 (N.D. Ill. 2025). Children of the Court sues on behalf of its members, their minor children, and their adult children.

36.     Mr. Weinhaus is a member and beneficiary of Children of the Court's services in that he has taken the Pledge while being a custodial parent of minor children and has adult children.

37.     Members of Children of the Court rely on its operating capacity attorney to assist it in litigation. Even Mr. Weinhaus as a member is allowed to rely on the operating capacity attorney to assist it in litigation but cannot do so here because of the actions of the Defendants.

*Judicocracy LLC- The Legal News Publisher*

38.     Mr. Weinhaus, early in his career formed *BlockTribune* (under a prior name) – a publication covering cryptocurrency news, later a cryptocurrency legal journal owned by his consulting company.  He also founded and ran: *DiplomaPrivilege* – a news site covering the movement to follow Wisconsin's lead in allowing bar admission without a bar exam; *ALABnews* and *AbusiveDiscretion* legal publications covering attorney misconduct and judicial eventually forming the publishing company, Judiciocracy LLC.

39.      As Weinhaus testified to the ARDC, Judiciocracy was created to report on legal matters as a *media* company, not as a lawyer or law firm, so that it could be sold as such and therefore he felt the rules of professional conduct required it be separate from his law firm in 2023 to protect both his legal practice and the publication for journalistic reasons.

40.     Judiciocracy acquired the publishing assets from Weinhaus' other entities in 2023 upon its formation and began positioning itself for sale as a standalone entity.

41.     Post-acquisition, Judiciocracy took full control of *ALABnews* and *AbusiveDiscretion* (and the other publications) including their news sites, their news production, their editorial standards, their customer service, their advertisements, their social media accounts, and their database backups of the publications.

42.     Judiciocracy's public records reporting generally publishes 10 stories per day across news sites with a shared staff and IT function. Weinhaus remains its CEO.

43.     Judiciocracy's editorial policy meets the highest standards in public records reporting. It also boasts some obvious corrective measures in case of errors or disputes:

    a.     Any factual error reported to the company or its publications is corrected in a timely manner;

    b.     Any update to a story case is encouraged to be submitted as a news lead;

    c.     Any story subject, like a legal professional, such as attorney or judge, is offered the chance, for free, to write their own factual rebuttal using the top-tier editorial and ombudsman-like standards.

44.     Although the company has made few errors, it has corrected them without hesitation. Multiple judges and lawyers have obliged themselves of Judiciocracy's straight news approach tor updating their own misconduct proceedings.

45.     In one instance, a judge in Texas, the Hon. Ursula A. Hall, reached out to the undersigned counsel (who forwarded the message along to Mr. Weinhaus) to have her own disciplinary record updated by Judiciocracy. Judiciocracy's news production process then took over.

46.     Judiciocracy's investigative reporting into public records has been recognized by the Cook County Circuit Court where it appropriately received a fee waiver for a data request into judicial substitutions.

47.     Judiciocracy makes FOIA requests of public bodies, gets sued in its own name, and sues in its own name where it is the Plaintiff in more than 20 lawsuits

48.     Judiciocracy is also a member of the Coalition Opposing Governmental Secrecy.

49.     Weinhaus sold a majority interest in Judiciocracy in 2024 but retains his membership in the Missouri limited liability company through his single member limited liability company.

## REPORTING ON THE *PARIS* CASE

50.     The "Paris case" is a well-known divorce case in the Chicago-land area, including real estate developer Marty Paris, his ex-wife, and their *seven* children. (*Paris v. Paris*, Cook County Circuit Court Case # 2016D004685 ("Paris Divorce Case") wherein Mr. Paris was jailed - three times -  while being insolvent, in bankruptcy, and unable to pay his lawyer's fees.

51.     Judiciocracy published a series of stories related to the Paris Divorce Case, researched and reviewed the public records, and found experts in the field of criminal procedure, citing, Dr. Isaac Amon, Professors Jayne Ressler of Brooklyn Law School, and Doug Rendleman of Washington and Lee School of Law to opine on the matter.

52.     One of those stories led the Hon. Regina A. Scannicchio to complain to the ARDC about Mr. Weinhaus' involvement with the Plaintiffs. ECF #26-1, Exhibit F, pgs. 1-8.

53.     She made multiple false claims (in fact all of them) by ascribing the speech about which she complained to Mr. Weinhaus, rather than in his capacity assisting the organizational Plaintiffs.

54. Judge Scannicchio made no complaints about anything other than Plaintiffs' organizational speech, but directed that attack against the Plaintiffs' attorney-executive, Mr. Weinhaus.

55. In one of her outlandishly wrong claims, Judge Scannicchio accused the Plaintiffs' executive of faking another judge's signature in an obvious attempt to use the Defendants' state authority to retaliate against the Plaintiffs for speech she did not like during an election year.

56. Weinhaus' then attorney, Ryan Cleys, responded, demonstrating that Judge Scannicchio had made that incorrect claim (and showed the other claims were wrong too), that the information from the Plaintiffs' site adequately represented the WILSON SETTLEMENT TERMS/docket, and that the speech was clearly that of the *Plaintiffs*, not Mr. Weinhaus. (See *Farah v. Double M. Express Inc*, Case # 1:24-cv-01757 N.D.Ill ECF #4-1 Exhibit to Corrected Mot. For Pro Hac Vice (*granted*).) ECF #26-1, Exhibit J, pp. 156-64.

57. Further, as the attorney in the case before Judge Wilson and familiar with the docket, Attorney Cleys represented that the speech in question was true.

58. Judge Wilson, according to the Defendants, has some complaint with the language of Plaintiffs' publications about which he will testify under oath. But, apparently, according to his court system, not the truthfulness. He has recused himself from further adjudicating the WILLSON SETTLEMENT TERMS only after the Defendants brought their charges in an admission that he was responsible for them *prior* to his recusal, as validated by Judge Stanton's ruling, *supra*. Judge Wilson had done what his docket said he did, until he decided not to, later.

59. Judge Wilson has never complained to the Plaintiffs about any speech.

60. Nobody has ever claimed the Plaintiffs' speech was illegal.

**Importance of Organizational Rights For An Organization's Access To An Attorney Protected Under the First Amendment Conferring Direct Standing**[2]

61.     State interference that keeps an organization from its attorneys violates the organization's First Amendment speech rights, as such associations are essential for collective expression and advocacy. *NAACP v. Button*, 371 U.S. at 428-29 (1963) ("We hold that the activities of the <u>NAACP, its affiliates and legal staff</u> shown on this record are modes of expression and association protected by the First and Fourteenth Amendments which Virginia <u>may not prohibit, under its power to regulate the legal profession</u>, as improper solicitation of legal business violative of [state law] and the Canons of Professional Ethics.").

62.     An organization exercises its First Amendment speech solely through agents like attorneys; thus, impairing those agents' ability to speak on its behalf effectively removes the organization's voice. *In re Primus*, 436 U.S. 412, 422 (1978) (recognizing that non-profits speak via attorney-agents, and regulations chilling this agency suppress organizational advocacy).

63.     Administrative punishment or license revocation of an organization's attorneys confers standing on the organization, as it directly injures its associational and expressive interests. *Brotherhood of R.R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1, 7 (1964). The Brotherhood case emphatically allows attorneys who work for constitutionally protected endeavors those very same protections. *Id.* at 8 ("And, of course, lawyers accepting employment under this constitutionally protected plan have a like protection which the State cannot abridge.")

---

[2] The Court wrote in ECF #57 that *Linda R.S.* controls the prior complaint. This Complaint has noted that these cases, coupled with the amendments made, directly demonstrate that the organization has rights to its attorneys for its own speech. Should the Court decide otherwise, then this is being offered by way of showing a clearly appealable issue for the advancement of organizational speech.

64.     Public policy demands that organizations have standing to challenge state actions punishing their attorney-agents <u>particularly for their work in assisting the organization</u>, as separating groups from counsel and attacking agents' speech violates core First Amendment protections for collective advocacy. *United Mine Workers v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967) (affirming organizational standing and speech rights when bar discipline impairs agency relationships). United Mine Workers informs the Court precisely what the Defendants are being allowed to get away with thus far:

> "The First Amendment would, however, be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed that prohibits free speech, press, petition, or assembly as such. We have therefore repeatedly held that laws which actually affect the exercise of these vital rights cannot be sustained merely because they were enacted for the purpose of dealing with some evil within the State's legislative competence, or even because the laws do in fact provide a helpful means of dealing with such an evil.

*Id.* (citing *Schneider v. State*, 308 U.S. 147 (1939); *Cantwell v. Connecticut*, 310 U.S. 296 (1940)).

**Defendants Attack Plaintiffs' Executive To Stifle Plaintiffs' Speech**

65.     Ultimately, the Defendants are using the following two pieces of Plaintiffs' speech to punish the lawyer who helped them speak it, to discourage lawyers from affiliating with Plaintiffs, and to keep the Plaintiffs from speaking where their speech is criticism of the judiciary:

      a.  Children of the Court, which seeks nationwide judicial reform posted a website. On its website, it posted a page called "Team." That page published that its "Board of Directors: TBD." It then showed several pictures including Mr. Weinhaus and Judge Wilson. The page listed two words - "Nationwide Enforcer" - under Judge Wilson's picture. It then posted Judge Wilson biographical information with a paragraph-long description culled from public information. The first sentence of that biography stated:

> "Although he sits on a bench in Cook County, Illinois, his order has created a national organization, advocating in every state. Judge Wilson is responsible for enforcing the funding of Children of the Court pursuant to his April 18, 2023 order in Cook County."

b. *ALABnews*, owned by Plaintiff Judiciocracy and the nation's leading publication covering attorney misconduct, published a story entitled "*Breaking: Dastardly Chicago Divorce Attorneys Hurst Robin Kay & Allen Have Own Client Thrown in Jail According to Legal News Journal*." The article included the following statement:

> "In an unprecedented 'slam' on a fellow judge, another Cook County judge and leader the Hon. Thaddeus L. Wilson immediately ordered an organization be started to keep judges like Scannicchio away from cases involving children."

The same article noted Mr. Weinhaus' involvement with the Plaintiff Judiciocracy and that "[Mr. Weinhaus] refused comment."

66. The speech in the above subparagraphs are hereafter referred to as "SPEECH IN QUESTION." The Defendants' Administrative Charge against Plaintiffs' key man for Plaintiffs' legal speech for the purpose of stifling Plaintiffs' speech is found at ECF #13-1, Exhibit A, pp. 1-6.

67. Plaintiffs' executive, Mr. Weinhaus, did not promote his own speech in either instance and the SPEECH IN QUESTION represents the speech of the Plaintiffs only.

68. Mr. Weinhaus' assistance was crucial in helping the organizations speak in both cases and to help create the SPEECH IN QUESTION, he was only fulfilling his duties to the organizations as attorney and officer.

69.     Mr. Weinhaus' own speech would have been very different had he been speaking on his own behalf and not on behalf of the Plaintiffs to which he later testified in the SPRINGFIELD STATEMENT.

*Defendants Ability To Directly Interact And Harm Plaintiffs*

70.     The Defendants' ability to use coercive power over attorneys who help an organization are amplified when that attorney serves in an executive capacity – especially a *volunteer* capacity following the terms of a third-party agreement. Thus, directly attacking the executive for his functions as an executive is a direct attack on the company's ability to operate and execute its functions.

71.     The Defendants have a mechanism for self-limiting their ability to directly attack the client's acts by going after its attorney for advice given to it to help it act legally.

72.     For example, Illinois Rule of Professional Conduct 8.4(a) prohibits a lawyer from violating the rules by acting through another, finding it misconduct when an attorney:

"(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another."

73.     Comment 1 to Rule 8.4(a) makes it clear that so long as the client acts legally, the attorney's counsel is protected.  **"Paragraph (a), however, does not prohibit a lawyer from advising a client concerning action the client is legally entitled to take"**

74.      In this way, the Defendants can use their power to prosecute an attorney for *his/her own wrongful* acts, but not for advising a company that to speak what is perfectly legal.

75.     When the Defendants wish to control, influence, harm, threaten, or punish an organization for speech Defendants do not like, Defendants can punish the organization by attacking those it employs decreeing the entity itself not responsible for its own speech and then purposely ascribing those actions to the individual who helped them take those actions.

14

76.    By doing so, the Defendants can ignore Rule 8.4(a), wherein comment 1 forbids the prosecution of an attorney in the present circumstances, for helping the Plaintiffs speak legally, and thus preventing the Plaintiffs' ability to speak.

77.    Thus, the Defendants remove their self-restraint on attacking entities from getting legal advice by prosecuting the entities' duty-bound officers and attorneys for the entities' actions not under Rule 8.4(a) but instead for "advising a client concerning action the client is legally entitled to take." ("ATTACK ENTITY'S ABILITY TO ASSOCIATE.") Among other harms, this prevents an organization from associating with attorneys for legal advice or its executives.

78.    When the attorney is the chief executive officer of the entity, the Defendants compound the problem by attacking the main person responsible to the entity for making it act through failing to recognize the entity's responsibility to act in its own interest and its duty-bound officers to help it act. ("ATTACK ENTITY'S OFFICERS FOR ENTITY ACTS").

79.    By charging an attorney-executive for misconduct for:

    a.    giving legal advice to an entity;

    b.    so the entity can perform legal acts;

    c.    then performing his duty to the entity for doing it; and

    d.    by refusing to acknowledge the entity is responsible for its own acts,

the Defendants are directly regulating Plaintiffs' acts including stifling their speech by removing the entity's ability to have access to executives and attorneys.

*Defendants Pick Up Pursuit of Plaintiffs' Speech*

80.    Absent supporting information from Judge Scannicchio to substantiate each of her false claims, Defendant Tammy Evans was tasked by the ARDC to pursue Mr. Weinhaus to further stifle Plaintiffs' speech because that speech related to the reform of the judiciary.

15

81.　On June 13, 2024, Weinhaus provided a sworn statement in Springfield, Illinois, represented by counsel ("SPRINGFIELD STATEMENT").

82.　Just Mr. Weinhaus did during the SPRINGFIELD STATEMENT, Ms. Evans broke down in tears during a break after hearing how Mr. Weinhaus was doing volunteer work for Children of the Court under Judge Wilson's enforcement, who then complained to the ARDC as to how Mr. Weinhaus volunteered, rather than address Mr. Weinhaus directly.

83.　Nonetheless, the Defendants, via Ms. Evans addressed the Plaintiffs directly in the only capacity it could, by addressing Mr. Weinhaus acting in his official capacity, which he was doing during the SPRINGFIELD STATEMENT, because the speech involved was only that of the Plaintiffs. Any statement hereafter stating or showing that Defendants addressed Mr. Weinhaus are all qualified by the fact that he was acting in his representative capacity for Plaintiffs at all times and they were directly attacking Plaintiffs in the only manner they could.

84.　The Defendants acknowledged that Mr. Weinhaus was acting in the capacity as the agent of the Plaintiffs during the SPRINGFIELD STATEMENT and there being no other way to reach the Plaintiffs, the Defendants elected to directly interact with Plaintiffs to stifle their speech by pressuring their agent in his representative capacity.

85.　Ms. Evans on behalf of the Defendants pressured Plaintiffs to stop pursuing judicial reform and pressured Mr. Weinhaus to stop helping Plaintiffs critique the judiciary. The Complaint fully incorporates the June 13, 2024 transcript. ECF #26-1, Exhibit H, pp. 23-150.

86.　The following are allegations and citations to the page numbers of the transcript from the SPRINGFIELD STATEMENT[3] [our underlines]:

---

[3] The Court in ECF #57 suggested that the Defendants had not been alleged to have attacked the Plaintiffs. Clearly, the Supreme Court's jurisprudence in *United Mine Workers* speaks to the obvious and direct way the Defendants attacked Plaintiffs as shown in the transcript.

16

a. On pages 49 Line 12 – page 50 Line 14, Defendants ARDC and Evans were told of Weinhaus' duties to the *news* process at Judiciocracy LLC's *ALABnews* publication, page 50 Lines 7-14.

**Weinhaus**: It's a <u>news</u> answer. It's not a law answer. It's a <u>news</u> answer.

**ARDC/Evans**: <u>I understand that</u>. But we're here because you're a licensed Illinois attorney. And as a licensed Illinois attorney, you're subject to the Illinois Rules of Professional Conduct. And there are certain rules as an attorney that we have to abide by.

The Defendants acknowledge that Mr. Weinhaus was acting completely within the scope of serving his duties to the entities, afforded the protection of Comment 1 to Rule 8.4(a).

b. On page 74 Lines 9-23, Defendants ARDC/Evans contend that the website in question is an entity's website:

**ARDC/EVANS**: On <u>your</u> website, <u>you</u> include… (line 9)

**ARDC/EVANS**: …that is from <u>your</u> website. Is that correct? (lines 20-21)

**Weinhaus**: It was from <u>Children of the Court's website</u>. (line 22)

**ARDC/Evans**: <u>Okay</u>… (line 23)

The Defendants accept (and cannot show otherwise) that the speech is other than entity speech.

c. On pages 79 line 11 through page 80 line 11 the following exchange occurred where Defendants ARDC and Evans admit that Children Of The Court's work was a group endeavor, not just that of Mr. Weinhaus, who was subject to a court order requiring his voluntary work for the organization:

**Weinhaus**: To be clear, I'm a little upset and I'm sorry if I get emotional, because this was on our website. And I didn't know it upset Judge Wilson. And when it was, both pages have been changed, okay. It linked to the court order that described it in full. And it wasn't meant to be misleading. It was meant to say exactly what his involvement was word for word, which we felt was accurate. This wasn't intended to be misleading but be fully relevant for a normal website

17

with a full link to a legal document. When we heard -- I'm sorry -- through [Weinhaus's personal attorney John Gallo] that Judge Wilson had called directly and was upset, I was like, "Well, take his face" -- I mean, we didn't mean to upset anyone. We're trying to thank him. <u>You know, my students and I put this organization together.</u> It's meaningful to us.

**ARDC/Evans**: <u>I understand that</u>.

**Weinhaus**: <u>I don't think you do</u>. And it's not your job to understand. But I'm a real person. I put my life into stuff that matters. I'm not even paid for this. <u>This is volunteer work.</u>

**ARDC/Evans:** <u>I understand that</u>.

**Weinhaus**. Judge Wilson gets me in trouble after I worked for nothing for this…

Party Admission that they understand that the organization is a *group* endeavor (entity speech), and that Weinhaus was following Judge Wilson's court order that he *volunteer* for it pursuant to his duty.

    d.   Pages 81-89 discuss the letter from Marcia Meis referencing the then version of the Judges page on Children of the Court's website, and including Weinhaus' involvement in the sending of the letter which was referenced EXHIBIT I of the same ECF #26-1. Additionally, that included:

Pg. 84 line 22 through pg. 85 line 1:

**ARDC/Evans**: But the language states: "Our organization is the recipient of ten years' worth of funding thanks to the order of Cook County Circuit Court judge, the Honorable Thaddeus L. Wilson, in case 2016."

As reference to the Judges page of Children of the Court still shows, this is accurate and entity speech. Defendants are fully aware of this entity speech and have no problem with it pursuant to their investigation and complaint against Mr. Weinhaus. It is directly analogous to the other entity speech for which they are bringing charges and not providing entity speech protection for which this Court is absolutely needed. Also, this

section references a letter provided in discovery by Marcia Meis where she questions the

"legitimacy" of the organization. The Defendants chose to believe Marcia Meis'

representation of the organization being illegitimate rather than give comity and respect

to Judge Wilson's court orders.

  e. Pg. 86 line 6 through pg. 88 line 5.

> **ARDC/Evans**: <u>When taken together</u>, the letter to Director Meis, the inclusion of Judge Wilson on the page that lists team, and the court order that <u>we've established</u> is a mix of the settlement agreement, settlement terms, and the actual body of the court order that he signed, Judge Wilson signed, can you see that <u>there might be confusion</u> when he's included as a team member, this portion of the court, or the order, and now this letter with him including at the bottom? Can you see that it <u>might be misleading</u> as to his involvement with your organization?

> **Weinhaus**: I just want to say, in my mind, because the words about him under his name were <u>I thought specific, accurate, correct, and without possibility of misconstruing for anyone who actually read what it said</u>. However, if you don't read the words that was said and you just see everything else and you look at it from maybe <u>not a lawyer's view</u> who like reads things, and yeah, someone could say he's leading the charge. <u>Not if they read it</u>. So part of my -- <u>why I'm so upset, you see, I can't be both right and wrong</u>. I was either right in the language I put and made a mistake, which is what I'm emotional about. Or I was wrong. And I wasn't wrong.

> **ARDC/Evans**: Here's some Kleenexes. I will say I know you've indicated that a large part of <u>your organization</u> is working with children who are the subject of custody disputes, dissolution proceedings before domestic relations judges, as well as their parents. And <u>when you consider that those individuals may not be lawyers like yourself and I</u> [sic], and they read documents, there is <u>a risk that there might be a misrepresentation</u> and <u>Judge Wilson might have feelings about being included in this</u>. Can you see that?

> **Weinhaus**: I do. And I don't discard his feelings. I see how someone could not read -- or not understand the limits that <u>I thought I was specific</u>. And the <u>marketing was maybe too good</u> from a social entrepreneurship perspective of exuberant students and <u>their faculty member who had put the legal protection</u> and thought.

Mr. Weinhaus again "put language" for "put the legal protection" in his legal

representative capacity but a judge "might have feelings" even though the language was

correct. Certainly, it was not illegal as an entity has a right to and an attorney to give it

that advice. The Defendants have still not been able to explain what was false other than

the organization hurt Judge Wilson's *feelings*, they understand that it was: <u>organizational</u>

marketing designed for the organization's <u>legal protection</u>. That is, it was Weinhaus

performing his duty for the entity for the entity's speech. The full context of the website

Defendants tried to discuss at the top is organizational speech.  The measurement

Defendants place on Judicial Reform-based Plaintiffs and any attorneys who associate

with them is that the readers "may not be lawyers." But the constrains them from such a

broad reading in every context based on Comment 1 to Rule 8.4(a).

     f.   On page 97 line 15 through pg. 98 line 4, Defendants ARDC and Evans worked to

        persuade Plaintiffs' key man from working in the news industry.

      **ARDC/Evans**: <u>What I'm trying to get out of you</u> is: Do you think there are other
      ways in which you can work toward a better domestic relations division <u>other</u>
      <u>than having articles published that make statements about sitting judges</u>?

      **Atty for Weinhaus**: Are there other ways?

      **Weinhaus**: I'm sure there are other ways.

The Defendants' purpose, what they are "trying to get out of Plaintiffs via their key man,

is to keep him away from helping produce news stories about sitting judges. Coupled

with subparagraph (a)'s excerpt above, this is an attempt to dissuade an attorney from

affiliating with the media, judicial reform, and the Plaintiffs in particular because they

comment on sitting judges. The Defendants are not trying to fix a 'truthfulness' problem

or enforce the law or live within the constraints of the law, they are trying to stop

coverage of public officials by attacking their agents, attorneys, and executives as they

are doing to Mr. Weinhaus. Let's quote them directly: **"articles published that make**

**statements about sitting judges.**" The intent is to stop articles about sitting judges altogether for the licensed attorneys who currently work with Plaintiffs and to dissuade those in the future.

g. On pg. 106 line 14 begins a discussion about the news story and first admits that the statements presumably meet the legal standards of "truthiness":

**ARDC/Evans**: There are statements that, <u>perhaps not to a lawyer</u>, but perhaps to a maybe less sophisticated individual <u>might read that article</u> and might think… there is <u>the possibility</u> that <u>someone might take this all into context… (p. 106 between lines 14 through 22)</u>
…
**Weinhaus**: …<u>the organization</u> is designed to keep judges who don't have children away from cases involving children is <u>a legitimate comment</u>. With the knowledge that she doesn't have or has never been a parent is <u>a legitimate public criticism</u>. All <u>the other stuff I had</u> in there was probably too much inside baseball. <u>We took it out</u>. It wouldn't have been in there. And I'm sorry. We weren't meaning to mislead. <u>It's a news story</u>. (p. 108, lines 11-19)

**ARDC/Evans**: <u>I understand</u>. I think here's the issue. You've already said <u>you have two hats. But you have a lawyer hat</u>. (p. 108, lines 20-22)

**Weinhaus**: Right.

**ARDC/Evans**: And perhaps <u>maybe somebody in your media organization that's a non-attorney, they're not bound by the Illinois Rules of Professional Conduct, but you are.</u> You are bound.

**Weinhaus**: <u>To protect my client</u>. (p. 109, line 4)

**ARDC/Evans**: As a lawyer, you're bound by <u>all of the Illinois Rules of Professional Conduct</u>. (p. 109, lines 5-6)

**Weinhaus**: Right.

**ARDC/Evans**: And <u>the concern is</u> -- I think there's better ways of maybe -- if you don't believe a judge is doing what they should be doing, <u>I think there are better ways than maybe having articles that you're affiliated with. And when I say "affiliated with," you're the publisher</u> -- you said at the time you were the publisher – (p. 109, lines 8-14)

**Weinhaus**: Yes. I still am.

**ARDC/Evans**: -- and you reviewed the article.

**Weinhaus**: I still am the publisher. I'm just not the main owner anymore.

**ARDC/Evans**: <u>I'd just caution you about what the content is. And what someone reading that content might imply from that content. (p. 109, lines 19-21)</u>

**Weinhaus**:  I understand. I do get that.

Defendants' approach is evident in this exchange and these serve as party admissions. They are concerned about the News media having an attorney "affiliated with" it helping it speak. They are clearly seeking to disassociate Plaintiffs from their key man, in their third complaint about the news (see Subparagraphs A and F, *supra*). Defendants aren't concerned about recklessly false or false content, but content "what someone reading that content might imply from that content." Defendants admit that "there are better ways of having articles" where an attorney "protects [his] client." Here, they want Weinhaus and any Plaintiffs' attorneys to refuse to protect Plaintiffs' right to speak by punishing them for successfully assisting the Plaintiffs' speech. It is clearly and evidently admission of unconstitutional intent and behavior of restricting free speech, associational rights, and creating a *Hobson's choice* for any attorney who wishes to assist a judicial reform organization, limiting Plaintiffs access to attorneys, legal advice, and rights to associate. Defendants make very clear they only want non-attorneys assisting with judicial reform speech because if its judicial reform speech, then the attorney, like Plaintiffs' current and future attorneys cannot be afforded the protection of Rule 8.4(a) Comment 1.

h.  On pg. 111 lines 5-19, the Defendants acknowledge the difference between Plaintiffs' speech and that of their target, who evidently did not speak:

**ARDC/Evans**: I also think, as Mr. Gallo can probably tell you, the Court -- and when I say "the Court," <u>the Supreme Court, does not like when attorneys, you</u>

know, make comments about sitting judges, about other attorneys, 4.4, that are the sole purpose of burdening, harassing, embarrassing, you know.

**Weinhaus**: Yeah. My comments were worse that got taken out that didn't get published.

**ARDC/Evans**: And that's probably very good and that is good.

**Weinhaus**: I understand the point so well, you don't want to know what I would have written.

**ARDC/Evans**: But don't. Because then you'll be back in front of us again.

Defendants fully understand that the speech is truthful, and that is the speech of the entities. Here, they admit that they don't even want to know what Weinhaus' own speech was, which very well have either been untruthful or harassing. The Defendants weren't of the mind that the speech was harassing in the end once they learned it was organizational speech. However, they opted to proceed to charges and to continue to harass Plaintiffs by attacking their attorney for the Plaintiffs' speech without acknowledging it.

87.     The Defendants used their coercive power over the chief executive officer of both organizations to directly regulate Plaintiffs' speech as it related to speaking about judges in a manner the Defendants do not like.

88.     The Defendants conducted both: ATTACK ENTITY'S ABILITY TO ASSOCIATE and ATTACK ENTITY'S OFFICERS FOR ENTITY ACTS.

89.     Ms. Evans on behalf of the Defendants also threatened Mr. Weinhaus' former attorney Mr. Cleys for demonstrating that the ARDC was being used in a political manner in contravention of the First Amendment.

90.     Ms. Evans on behalf of the Defendants thus not only threaten and punish executives and lawyers who help Plaintiffs critique the judiciary, but also threatened those targeted attorneys' own counsel.

*Defendants Admit The SPEECH IN QUESTION Is the Plaintiffs' Speech*

91.     Defendants Evans and the ARDC admitted that the SPEECH IN QUESTION was that of the Plaintiffs and not that of Mr. Weinhaus in myriad ways including:

    a.  During the deposition admitting that the SPEECH IN QUESTION was that of the Plaintiffs and that Mr. Weinhaus had a duty to the Plaintiffs;

    b.  Providing no evidence prior to prosecuting Mr. Weinhaus that the SPEECH IN QUESTION was his own;

    c.  Providing a charge against Mr. Weinhaus that includes a factual basis regarding the SPEECH IN QUESTION that can only be deemed that of the Plaintiffs and acknowledged Mr. Weinhaus' duty to the Plaintiffs;

    d.  Responding to discovery in the underlying enforcement action subsequent to the original complaint that they have no evidence to show that the SPEECH IN QUESTION was not that of the Plaintiffs;

    e.  Responding to discovery in the underlying enforcement action subsequent to the original complaint that they have no evidence to show that the SPEECH IN QUESTION was that of Mr. Weinhaus;

    f.  Hiding from their charge complaint that the *ALABnews* piece specifically mentioned that Mr. Weinhaus "refused comment" to delineate what they uncovered in the SPRINGFIELD STATEMENT – the SPEECH IN QUESTION is entity speech.

92.     The controlling authority of each Plaintiff contends that the SPEECH IN QUESTION is organizational speech of the Plaintiffs and never that of Mr. Weinhaus.

93.     This Court also has as a matter of record Mr. Weinhaus' sworn testimony in the underlying enforcement action, the SPRINGFIELD STATEMENT, demonstrating that the SPEECH IN QUESTION is organizational speech of the Plaintiffs and not that of Mr. Weinhaus.

94.     The investigation and charges are being pursued to punish Plaintiffs for Plaintiffs' speech on their websites because their key man, Mr. Weinhaus, was also an attorney who is under their watchful eye. But the ARDC and Scannicchio earlier by default acknowledged that *no allegations have been tendered against Weinhaus*:

    a.   That Weinhaus' work assisting the Plaintiffs' speech was in the practice of law or for his behavior during any case or for criticism of a judge before whom he had an active case;

    b.   For a crime;

    c.   For even a tort;

    d.   For anything other than assisting the Plaintiffs in pursuit of *their respective chartered missions*.

    e.   For violating his duties to the organizations, but rather for exactly tending to those duties.

95.     Defendants are pursuing Mr. Weinhaus under his roles as officer and in the operations of the Plaintiffs to frustrate Plaintiffs' pursuits of judicial reform.

*Defendants' Speech-Chilling Acts*

96.     Eight months after the SPRINGFIELD STATEMENT, mid-February 2025, Judiciocracy resumed its investigation into charges of lawyer-judge bribery in Cook County Courts, after those allegations began appearing in several federal lawsuits. Plaintiffs fear of being scooped seemed more realistic than the Defendants' continued pursuit of their key man.

97.     Not having heard anything from the ARDC in those eight months, Judiciocracy instructed Weinhaus to verify certain accusations based on public records, additional court records provided to Judiciocracy after Chief Judge Evans' fee waiver, and traditional reporting techniques.

98.     In response, 8.5 months after the SPRINGFIELD STATEMENT with no new information or accusations, the ARDC announced that it sought to start the process to bring an official charge against Weinhaus ("CHARGE PURSUIT") for the purpose of stifling the speech and activities of the Plaintiffs.

99.     Upon learning of the CHARGE PURSUIT, Plaintiffs were unable to indemnify Weinhaus due to lack of resources and which immediately caused Plaintiffs to be unable to perform the report and judicial reform work they do resulting in a harm to the organizations and Judiciocracy's publications.

100.    Due to Weinhaus' decades of experience and deep familiarity with the topic, any replacement or even complement would be prohibitively expensive and impossible based on the Defendants' intent to punish any attorney who wished to help the Plaintiffs' judicial reform missions.

101.    Likewise, Children of the Court could no longer send its letter campaigns which had previously yielded positive results, such as the interaction and interview with Judge William Stewart Boyd.

102.    The only reason *more* letters have not gone out is due to the chilling effect of the Defendants' pursuit of Children of the Court's *volunteer* Executive Director and its threat to do so as evidenced above against any future attorneys who assist it with Judicial Reform.

103.    Each Plaintiff is now faced with an officer and director who is unable to perform his duties for either entity because the Defendants refuse to recognize the entities' legitimacy and existence to afford their staff the benefit of Illinois law – that is Comment 1 to Rule 8.4(a).

104.    Recently, Judiciocracy had to pay a European journalist with British certification as an outside consultant and have a separate member publish the story, instead of Mr. Weinhaus, due to the speech-chilling actions of the Defendants.

105.    In fact, Plaintiffs have lost access to their own executive, attorney, officer and director on key decisions, including but not limited to instituting this lawsuit as a result of Defendants actions.

*Loss of Access to An Attorney Is Significantly Speech-Curtailing*

106.    Weinhaus is an international judicial reform advocate.

107.    Due to his public interest litigation and work with the Plaintiffs he has become nationally recognized as among America's most aggressive judicial reformers.

108.    The Defendants actions did not just affect Weinhaus but instead have prevented Plaintiffs from hiring any attorney to perform the function Weinhaus served.

109.    The Plaintiffs are able, only after expense, to find an attorney to stand before this Court upon whose measured judgment counsel relies, while complying with the ethical rules.

110.    However, the Plaintiffs would have been able to have Weinhaus stand before the Court for less cost and of like-service if not for the Defendants' actions.

111.    In fact, the Defendants have even used these proceedings to threaten Weinhaus with further sanction through their regular use of "aggravating factors" by declaring that Weinhaus was trying to make an "end run around his disciplinary proceedings." ECF #21 at pg. 15.

112.    Nothing could be further from the truth as Plaintiffs argued many times on the Court's docket that the Defendants can and should proceed against Mr. Weinhaus for violations of the rules of ethics, but not for following them by fulfilling his duties to his clients which he is required to do.

113.    That's the debilitating part of the Defendants' actions for any organization whose speech they don't like – they can just create a *Hobson's choice* for an attorney as they are doing to the Plaintiffs – effectively arguing that if an attorney for Plaintiffs 'Legally fulfills his/her duty to help Plaintiffs publish Judicial Reform content and they attorney will be punished.'

114.    That behavior explains why no attorneys will help the Plaintiffs speak further and are causing the limitation of its activities.

115.    Plaintiffs' inability to have an attorney help it speak in the media is limiting its coverage and exposing it to significant legal risk while increasing its costs.

116.    The Plaintiffs have searched and found no attorneys willing to perform the role Weinhaus filled precisely because the risk from the Defendants' speech chilling behavior was so certain to repeat itself and as such the Plaintiffs' businesses has lost opportunities to speak, advertising revenue, and had to pay third parties to less successfully fill the role and with lesser experience than an attorney would have.

117.    Thus, the loss of access to their key man's efforts via the Defendants' actions have and would continue to cause irreparable damage to the important missions of the Plaintiffs.

118.    As a direct result of Defendants' broad overreach into trying to regulate the speech and actions of the Plaintiffs, their speech has been curtailed; each Plaintiff has been forced to limit its actions, chilling their speech and frustrating their purpose.

119.     Each Plaintiff has been prevented from associating with an attorney to serve in the capacity their key man once filled in its publishing operations.

120.     Each Plaintiff has the right to have an attorney bound by the ethical rules of professional conduct to serve it for its publishing operations where the only purported violation of its attorney serving in that capacity is helping the Plaintiffs speak legally.

121.     The loss of ability to have an attorney serve in that capacity is a severe restriction on the Plaintiffs' right to speak and associate with attorneys.

122.     Absent relief prohibiting the ARDC from proscribing *Plaintiffs' SPEECH IN QUESTION*, to Weinhaus absent the protection of Comment 1 to Rule 8.4(a), Plaintiffs will be prevented from their judicial reform activities, the organizations' voices will be muted, and their missions mooted.

123.     As such, the Defendants should be enjoined from using the SPEECH IN QUESTION of the Plaintiffs to attack anyone who owes the Plaintiffs a duty absent a finding that the SPEECH IN QUESTION is illegal.

124.     The Defendants' "long leash" of state authority cannot extend inside organizations having nothing to do with the practice of law, especially those that advocate for judicial reform.

*Damages*

125.     The Plaintiffs have suffered financial damages from the ARDC's wrongful actions.

126.     Judiciocracy LLC has suffered at least the following losses:

   a.  Diminished competitive edge and journalistic output due to being scooped by competitors on critical stories about jailing divorce litigants unable to pay attorneys. Halted groundbreaking coverage on lawyer-judge bribery allegations in county circuit court, impairing mission to expose judicial incompetence, overreach, and corruption;
   b.  Inability to publish stories without necessary legal expertise for liability navigation, creating existential risk and immediate harm through delayed or abandoned publications;

29

    c. Chilled overall speech, preventing full publication until judicial intervention.
    d. Loss of ability to publish valid criticism of attorney disciplinary commissions, judiciary, and legal system for the public;
    e. Irreparable damage from restricted speech and operational freedom;
    f. Indirect control by regulatory body which is advocating direct control by attacking its executive;
    g. Defendants successfully pressured Plaintiff's key man to violate his duties to Plaintiff; and
    h. Diminished integrity and lowered public benefit.

127.    Children of the Court has suffered at least the following losses:

    a. Inability to send letters with attorney operating review or fully operate, creating existential risk to advocacy for intelligent case assignment and child participation in court improvements;
    b. Impaired governance and operational continuity due to investigation impacts;
    c. Denied reliable access to attorneys for work, limiting legal counsel beyond silence advice;
    d. Forced breaches of settlement agreements in spirit, restricting core focus on publishing and speech;
    e. Defendants successfully pressured Plaintiff's key man to violate his duties to Plaintiff; and
    f. Diminished integrity and lowered public benefit.

*The Constitutional Precedent Is Certain*

128.    The Supreme Court of the United States makes clear that even an attorney's rights to criticize judicial processes or public officials is sacrosanct, unless there is a pending case (or attorney advertisement)[4].

"In *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991), the Court was asked to determine whether Nevada's prohibition on extrajudicial statements was constitutional. After reviewing the history of professional obligations imposed on attorneys, Chief Justice Rehnquist quoted from two cases that discussed the tension between a lawyer's First Amendment rights and his duty to preserve the fairness of the trial:

**"Of course, a lawyer is a person and he too has a constitutional freedom of utterance and may exercise it to castigate courts and their administration of justice. But a lawyer actively participating in a trial, particularly an**

---

[4] The Plaintiffs appreciate the Court acknowledging *Gentile* in its dismissal order, however, it supports Plaintiffs case, not the other way around. The only reason the Defendants can attack Weinhaus for *his* out-of-courtroom statements would be in the context of litigation or attorney advertising. However, here they are going after the speech of the Plaintiffs, attributing it to Weinhaus and ignoring *Gentile*! This court can stop the first wrong alone.

> **emotionally charged criminal prosecution, is not merely a person and not even merely a lawyer….**
>
> **He is an intimate and trusted and essential part of the machinery of justice, an 'officer of the court' in the most compelling sense."**

*Gentile*, 501 U.S. at 1072 (quoting Justice Frankfurter's dissent in *In re Sawyer*, 360 U.S. 622, 666, 668 (1959))." *Devine v. Robinson*, 131 F. Supp. 2d 963, 964-965, (N.D. Ill. 2001)

129.    There is no question the ARDC has regulatory power over Weinhaus for Weinhaus' conduct as an *attorney* and his actions as such, and particularly where he is an attorney involved in an active case. *Id. Or helping Plaintiffs conduct illegal speech.* But now Defendants believe they can reach into the Plaintiffs' operations to punish an attorney with no case pending, with no marketing of attorney services, without any illegal speech, and punish the entities' staff for helping the Plaintiffs' speak legally about judges.

130.    The Plaintiffs relied on Constitutional protections before and during their formation to engage their key man and pursue their missions.

131.    The Defendants are only attacking the staff of the Plaintiffs because of the *Plaintiffs' speech* – their criticism of various judicial actions, the injustices that followed, or pursuit of reform.

132.    As evidence of Defendants' continued bad faith including the above:

   a.    no person either tangentially or directly – whether the Defendants, Judge Scannicchio, Judge Wilson, or any attorneys – have reached out to Plaintiffs to correct even a single error in what is fully truthful and protected speech. Judge Hall's behavior serves as guidance – she asked for coverage about updated and truthful information; she received it;

b. Defendants have failed in discovery to produce any evidence that the SPEECH IN QUESTION wasn't that of the Plaintiffs and have provided no witnesses who can do so either; and

c. Defendants have made no claim that the SPEECH IN QUESTION is illegal, because its very legal.

133. The Defendants bad faith is also evident on the face of their Complaint and from their admissions during the SPRINGFIELD STATEMENT.

134. The Defendants case is based on Plaintiffs calling a page on their website "TEAM" and then print (and applaud) the consequence of orders of the Court.

135. Being an attack dog for thin-skinned elected officials to stifle Judicial Reform speech is the consummate overreach of state authority that requires the federal court's jurisdiction and protection.

136. There is no property or *in rem* jurisdiction to award to anyone that a state could handle – this is state authority over-reach over First Amendment rights to associate and speak for which the federal courts have a crucial role play.

137. Plaintiffs have no state remedy in that they cannot participate in the Defendants' case against their key man.

138. Plaintiffs and Mr. Weinhaus have divergent interests.

139. Mr. Weinhaus cannot adequately represent the interests of the Plaintiffs in his state proceeding.

140. Mr. Weinhaus' entire successful legal career in which he invested heavily as a late-stage career move is based on his law license.

141.    Mr. Weinhaus could and should and likely will sacrifice the interests of the Plaintiffs who have other rights, such as the rights to future access to attorneys whose speech is clearly threatened.

142.    Mr. Weinhaus has already sacrificed his duties to the Plaintiffs as a result of the actions of Defendants and will continue to do so until the Plaintiffs' speech is considered their own.

143.    In no manner can the Plaintiffs protect their own rights other than in this Court, particularly due to the involvement of the Illinois Supreme Court in the action against Plaintiffs' speech, invoked by the Defendants in the SPRINGFIELD STATEMENT and by their other arm which Ms. Meis runs – who claimed Plaintiffs are not "legitimate."

144.    Plaintiffs' speech is about the legal profession and the justice system and requires an active participant in the justice system who lives by and understands its rules to truly help reform the system.

145.    But even if it didn't, Defendants have power over Plaintiffs' speech through the actions described above that limit its ability to have an attorney work in an operating capacity and Defendants have power over Plaintiffs' ability to get legal advice through the actions described above.

146.    Defendants are abridging Plaintiffs' rights by employing both ATTACK ENTITY'S ABILITY TO ASSOCIATE and ATTACK ENTITY'S OFFICERS FOR ENTITY ACTS, by directly attacking its attorneys, now and threatening the future ones for the speech of the entities.

147.    As both being arms of the Illinois Supreme Court and the actions above, Marcia Meis' AOIC and the Defendants are acting to purposely over-extend their power to protect sitting judges from fair, truthful, judicial reform speech, and acting like the entities do not exist.

148.    Judicial Reform speech deserves extra protection, not the other way around, as the Defendants contend, as part of their pattern of bad faith acts.

149.    Mr. Weinhaus' temporary cessation of activities was based on the looming threat of persecution by Defendants and that threat came to bear.

150.    Mr. Weinhaus' resumption of his activities for Plaintiffs was met with swift response from Defendants and the implementation of the CHARGE PURSUIT.

151.    If the Defendants were to provide the declaratory and/or injunctive relief requested herein, Mr. Weinhaus would return in full capacity to the Plaintiffs and the Plaintiffs would be able to attract other attorneys and executives currently chilled from assisting Plaintiffs.

152.    The intent of the Defendants is to directly stop the speech of the Plaintiffs.

153.    Defendants are attacking and will continue to attack the Plaintiffs' speech sounding in judicial reform against "sitting judges" unless stopped by this Court of their Constitutional overreach.

154.    Therefore, Plaintiffs move for damages and for declaratory and equitable relief.

## <u>COUNT I</u>

### Violation of Plaintiffs' First Amendment Rights

155.    Plaintiffs incorporate the above paragraphs by reference as if fully set forth herein.

156.    Defendants, acting under color of state law, deprived Plaintiffs of their rights under the First Amendment to the United States Constitution by pursuing their Director and Officer Weinhaus for the speech of the Plaintiffs because he is an attorney.

157.    Defendants' actions have severely curtailed Plaintiffs' speech and limit their ability to function.

158.    There is nothing speculative or hypothetical about the Defendants' actions towards Plaintiffs.  Defendants have conceded that their actions are exclusively for the speech of the

Plaintiffs by including only Plaintiffs' SPEECH IN QUESTION in their charges against an attorney without affording the attorney the protection of the same rules.

159.   That is, the attorney was required by duty to advise the Plaintiffs to make the SPEECH IN QUESTION, the SPEECH IN QUESTION was legal and / or there is no claim that it was not legal, and the attorney is only being attacked because the SPEECH IN QUESTION relates to Plaintiffs' pursuit of Judicial Reform which the Defendants seek to stop.

160.   Thus, the Plaintiffs and Defendants are adverse.

161.   Defendants have interfered with Plaintiffs' ability to have its Officer and Director fulfill his fiduciary duties.

162.   Defendants have caused Plaintiffs to expend significant resources to defend their rights, caused Plaintiffs damages through necessitated altered their activities, have stifled and chilled Plaintiffs speech.

163.   Defendants have caused a chilling on effect on Plaintiffs' speech and operations.

164.   The injuries described herein are a direct result of Defendants' conduct towards Plaintiffs – particularly refusing to recognize their own rights to speak by attributing Plaintiffs' speech to Weinhaus for the purpose of chilling and stopping it.

165.   The Defendants' complaint against Plaintiffs SPEECH IN QUESTION by targeting their attorney flagrantly and patently violative of express constitutional prohibitions.

166.   Defendants' attacks against legal Judicial Reform speech is a process they can and will repeat again and again even were they to feign dropping it "for now" which they have not done because creating the expense for Plaintiffs and their key man is part of the chilling effect of the rights-violating actions.

167.    The Court's decision to grant relief would immediately grant redress because it would allow the Plaintiffs' attorneys – now and in the future – to be spared liability for helping the Plaintiffs speak up in matters of Judicial Reform without risk of their careers at the hands of the Defendants.

168.    The SPEECH IN QUESTION and other speech that can in the future to be shown to be that of the Plaintiffs as easily as the SPEECH IN QUESTION is protected as legal speech and the Plaintiffs have the right to an attorney to advise them as such without the attorneys being prevented from practicing in the future or threatened similarly.

169.    The speech of the Plaintiffs is important and in the public interest as evidenced by the Defendants' own negligence in doing their duty in finding actual infractions under those to whom they cater such as in the same news article about Plaintiffs' SPEECH IN QUESTION, the offending attorney Brian Jason Hurst represented a man he had thrown in jail and in the same proceeding represented his adversary in direct violation of Rule 1.9.

170.    Disclosing the Defendants' malfeasance in that matter requires work and exposure of the Illinois Supreme Court-run Defendants who have stifled the full coverage of it by attacking Plaintiffs' SPEECH IN QUESTION.

171.    Defendants have offered the protection of entity speech to similar speech to the SPEECH IN QUESTION when the topic was not Judicial Reform. Defendants have selectively chosen to ignore the limitations on their own authority because the speech involved was related to Judicial Reform and as such this is selective prosecution to stifle speech about public officials and judges made by an entity to punish the entity the only way it can – by attacking its lawyer.

172.    Defendants have violated and will continue to violate 42 U.S.C. § 1983 when, as persons acting under the color of Illinois law deprived Plaintiffs of their rights and privileges as secured by the Constitution of the United States of America absent action of this court.

173.    Plaintiffs have actively searched for an operating attorney/executive/director replacement, speaking to attorneys in court or at conference meetings, attorney social gatherings, and sending out emails to attorneys most familiar with the organization marketing the benefits of the roles but have been unable to find even one attorney interested in fulfilling the duties formerly performed (and still owed) by its key man.

174.    But for the actions of the Defendants and their continued risk of being repeated, Plaintiffs would be able to exercise its full First Amendment rights that are currently being chilled and would have the duties owed them fulfilled.

## PRAYER FOR RELIEF

**Wherefore**, Plaintiffs respectfully request that this Court:

a.      Enter a judgment declaring that Defendants' actions violated Plaintiffs' rights under the First and Fourteenth Amendments to the U.S. Constitution;

b.      Declaring that that the SPEECH IN QUESTION is that of the Plaintiffs;

c.      Enjoining the Defendants from removing protections of the Illinois Rules of Professional Conduct for Plaintiffs' attorneys for advising its clients and in no way barring the Defendants from pursuing Plaintiffs' attorneys for advising Plaintiffs illegally – such as embodied in Rule 8.4(a) Comment 1;

d.      Issue an injunction preventing Defendants from engaging in further unconstitutional conduct by attacking attorneys who advise organizations who conduct Judicial Reform;

e.     Award Plaintiffs compensatory damages;

f.     Award Plaintiffs punitive damages;

g.     Award Plaintiffs reasonable attorney's fees and costs under 42 U.S.C. § 1988; and

h.     Grant any and all such further relief as this Court deems just and proper under equity or law.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury on all issues so triable.

Dated: January 14, 2026                    Respectfully Submitted:

                                           *s/ Antonio Valiente*
                                           Antonio Ernesto Valiente-Rivera
                                           N.D. Ill. Gen. Bar No.: 12326 2
                                           TORRE DE LA REINA - SUITE 203
                                           450 AVENIDA DE LA CONSTITUCION
                                           SAN JUAN, PR 00901
                                           Tel: (787) 782-9544
                                           Email: lcdoavaliente@live.com

## CERTIFICATE OF SERVICE

I, Antonio Ernesto Valiente-Rivera, do hereby certify that I have caused to be sent to Defendants who have appeared by counsel through the Courts efiling system.

                                           *s/ Antonio Valiente*
                                           Antonio Ernesto Valiente-Rivera
                                           N.D. Ill. Gen. Bar No.: 12326
                                           TORRE DE LA REINA - SUITE 203
                                           450 AVENIDA DE LA CONSTITUCION
                                           SAN JUAN, PR 00901
                                           Tel: (787) 782-9544
                                           Email: lcdoavaliente@live.com